## COPELAND v. BENNETT.

### No. 4707.

Court of Civil Appeals of Texas. El Paso.
April 26, 1950.

Rehearing Denied May 24, 1950.

H. O. Metcalfe, Marfa,.Bill Holland, San Angelo, and Whitaker, Turpin, Kerr, Smith & Brooks, Midland, for appellant.

Fred O. Senter, Jr., Marfa, and Runge & Hardeman, San Angelo, for appellee.

McGILL, Justice.

This is an appeal from a judgment of the 83rd District Court of Presidio County.

L. M. Bennett sued Joe W. Copeland to enforce the specific performance of the sales provision of a contract entered into between them on the 6th day of December, 1946. The trial was to a jury, but at the conclusion of the testimony the Court instructed a verdict in favor of the plaintiff and rendered judgment directing the transfer of certain ranch property, the subject matter of the controversy, to the plaintiff on the payment of a sum specified therein. From that judgment the defendant has appealed.

The case was determined in the trial court, and is determinable here, on the basis of the written contract. As a joint and mutual undertaking the parties here undertook to gather together a large area of ranch lands in the rugged portions of Jeff Davis, Hudspeth and Presidio Counties. On September 7, 1946, they jointly acquired from L. F. Burris and wife a considerable block of lands, some in fee, with deferred payments, and some leasehold. As a sort of preamble to their contract that fact was recited and it is further set out that extensive improvements will be necessary to put such property in condition for the successful operation thereof and to lease it at the best possible rental, and that it will be essential to meet the cost of such improvements when made and each agreed to promptly pay his equal one-half of such costs, including the principal debt, interest and rentals on the lands acquired. It is further stated it is recognized by each party to the contract that failure of either party to meet his one-half of the several obligations together with his one-half of the cost of such improvements promptly will greatly inconvenience the other and require such other party to pay not only his one-half but also the other party's one-half of such indebtedness. It is further recited that it is also recognized by each party that individual financial involvement on the part of either party to the contract would likewise work hardship and inconvenience to the other and require him to pay off such obligations in order to protect his own interest in the ranch property, and that for the purpose of preventing the happening of the very things and hazards mentioned and recited and for the purpose of protecting himself and themselves and their interests in said ranch properties against all such matters and contingencies the contract is made. Paragraph four of the contract then follows. We reproduce it in full: "(4) Now, therefore, for and in consideration of the premises aforesaid and of the mutual agreements, promises and covenants herein made by each party to the other party; and of the mutual benefits and advantages which will accrue to each of said parties by reason of the making and carrying out of this contract, I, the said Joe W. Copeland, do hereby contract and agree with the said L. M. Bennett, that in the event I fail to promptly pay, at and upon the respective maturities thereof, at the time

or times, in the amount or amounts, and in the manner, as provided in said deed, notes, State purchase price and interest obligations and in said grazing leases, hereinbefore referred to, my one-half of the principal and interest installments, provided for in said five Vendor's Lien Notes, and my one-half of the State principal and interest indebtedness, owing, accruing and to accrue on said unpatented lands, and my one-half of the grazing lease rentals maturing under the grazing leases described in and transferred in and by said above mentioned deed, and my one-half of all taxes against said properties, as they become due and before becoming delinquent or in default, and my one-half of the cost of all improvements, labor and materials used therein, heretofore or hereafter made upon said properties, or any part thereof, or my one-half of any indebtedness which may be hereafter incurred in the purchase or lease of any additional ranch lands or ranch properties, either as purchase price therefor or interest thereon, or grazing lease rentals thereon, or taxes or improvements thereon, at the time or times, in the amount or amounts and in the manner provided therefor in the contract of purchase or lease or in the contract or contracts for improvements thereon, then and in that event, I hereby agree and contract with said L. M. Bennett to then, at the date of such default, sell and convey to the said L. M. Bennett, his heirs, executors, administrators or legal representatives, all of my undivided interest in and to said lands, premises, properties and improvements, both fee title and leasehold title, described in and conveyed by said deed above mentioned from said L. F. Burris and wife to said Joe W. Copeland and L. M. Bennett, at and for the amount which I then actually have invested in cash in said ranch lands and properties and improvements, as well as all of my undivided interest to and in any other lands and improvements and ranch properties, which the said Joe W. Copeland and L. M. Bennett may hereafter jointly purchase, also at and for the amount which I then actually have invested in cash in said additional lands, improvements and ranch properties, both fee simple title lands and leasehold lands, *and from such purchase price for said lands, both original and additional lands the said L. M. Bennett is authorized to deduct whatever total amount I, the said Joe W. Copeland may then owe to said L. M. Bennett for moneys theretofore advanced by said L. M. Bennett to me, or for my account, for the purpose of paying my one-half or any part of my one-half of any principal or interest installments on said notes or any of them, or on my one-half of any State principal or interest indebtedness, or on my one-half of the grazing lease rentals, or on my one-half of the taxes, or on my one-half of the cost of any labor, materials and improvements, or on my one-half of the cost of any additional lands which may have been purchased or leased, by us,* (emphasis ours) the balance of such purchase price to be so paid to me or my heirs, executors, administrators or legal representatives, by said L. M. Bennett, in cash, at Marfa, Texas, within Sixty days after the date of my said default hereinbefore referred to, my contract of sale herein provided for to begin and take effect and date from the date of such default above provided for; and the provisions and contract herein now provided for, in event of such default, shall apply to and bind and be in effect, both as to myself individually, if alive at that time, and my estate and my heirs, executors and administrators, if I am not alive at that time; and the said L. M. Bennett, for the considerations aforesaid, hereby accepts said contract of sale here so made, and hereby agrees to purchase said undivided one-half interest of said Joe W. Copeland, under the contingencies and at and for the purchase price and terms hereinabove provided for."

Paragraph 5 is in all respects similar to paragraph 4 except that Bennett agrees to sell and Copeland agrees to buy.

We are first confronted with Appellant's point that the judgment is not a final judgment and hence not appealable, because it does not dispose of the matter in controversy unless plaintiff should elect to pay into court for the use of defendant on or before March 27, 1950, $15,859.53, the amount found to be due by the court under

the sales clause above quoted. The relevant portion of the judgment is:

"It Is Further Ordered, Adjudged and Decreed By the Court that plaintiff, L. M. Bennett, deliver into the registry of this court, on or before six months from the date hereof, to-wit: on or before the 27 day of March, 1950, the sum of Fifteen Thousand Eight Hundred Fifty-nine and 53/100 ($15,859.53) Dollars.

"It Is Further Ordered and decreed by the Court that the Defendant, Joe W. Copeland, do execute and acknowledge proper conveyances, selling and conveying the above described real property, fee and leasehold estate, and the personal property to plaintiff, L. M. Bennett, and that said conveyances be deposited by said defendant with the Clerk of this Court on or before the 27 day of March, 1950, and it is further ORDERED that the Clerk of this Court deliver said conveyances to the plaintiff, L. M. Bennett upon delivery by the plaintiff L. M. Bennett of the consideration hereinabove directed, and that contemporaneously with the delivery of said conveyances to plaintiff the Clerk deliver such consideration to the defendant, Joe W. Copeland, in and as payment for such conveyances.

"It Is Further Ordered and Decreed By the Court that if the defendant should fail or refuse to deposit proper conveyances with the Clerk of this Court as hereinbefore ordered, then, providing plaintiff has delivered unto the registry of this court said sum of $15,859.53 as hereinbefore ordered, this decree shall operate ipso facto as a sale and conveyance of all interests of defendant, Joe W. Copeland, in and to said property to the plaintiff with the same force and effect as if sold and conveyed by the defendant, Joe W. Copeland, as hereinbefore ordered and without any further order or decree of the court."

It should be added that the defendant had filed his Second Amended Original Answer and Cross Action by which he sought an equitable accounting in reference to and a partition of the property the subject matter of the controversy:

By granting plaintiff specific performance the court necessarily impliedly denied any relief on defendant's cross-action seeking an equitable accounting and partition. The judgment does not leave it optional with plaintiff to deposit the money or with the defendant to deposit the deed in the registry of the Court on or before March 27, 1950. It requires each party to do so and then provides that if the plaintiff has deposited the money and the defendant has not deposited the deed the decree itself shall operate as a conveyance. True, it makes no provisions as to the right of the defendant should plaintiff fail to deposit the money within the allotted time. Except for the unusual length of time allowed for plaintiff's performance the decree conforms with the decrees customary in suits for specific performance. In such cases, the law attaches to the plaintiff's failure to deposit the money within the time specified, the consequence that his right to specific performance is thereby lost. Kalklosh v. Haney, 4 Tex.Civ.App. 118, 23 S.W. 420; Fordtran v. Donovant, 54 Tex.Civ.App. 564, 118 S.W. 768, at page 770, and cases there cited; Hart v. Wilson, Tex.Civ.App., 281 S.W. 339, reversed on other grounds, Tex.Com.App., 288 S.W. 133; Lockwood v. Frost, Tex.Civ.App., 285 S.W. 874.

We have concluded that this legal consequence attaches to the decree should plaintiff fail to perform within the specified time the same as though the decree had so provided, and hence that it does finally dispose of the case should Bennett fail to make the deposit as specified. In such event Copeland's right to the trial of his cross-action would be rejuvenated and he would be entitled to a hearing thereon in this suit or in another suit brought for an equitable accounting and a partition, in which plaintiff could not assert any right of specific performance, the judgment being res adjudicata as to this issue. This, we think, would follow as another legal consequence of plaintiff's failure to perform and hence the failure of the decree to so provide does not affect the finality of the judgment. The Chief Justice entertains grave doubt as to this point, strongly inclining

to the view that if Bennett failed to make the deposit another judgment would be required to dispose of the case finally. However, he does not feel sufficiently sure of his position in this respect to warrant his dissent, and he participates in disposition of the appeal on its merits, Associate Justice Sutton and the writer being unable to agree as to the disposition of the appeal on its merits.

The question which has given us most concern and our disposition of which is decisive of this appeal is presented by appellant's second point, which is to effect that the contract declared upon is without equity in that it provides for a remedy by specific performance so harsh and inequitable as against the defaulting party in regard to the price to be paid by the other party as to make it an unconscionable forfeiture not enforceable by the equitable remedy of specific performance. This question involves a proper construction of paragraph 4 of the contract above quoted, construed of course when considered with the entire contract. In this connection Section 11 of the contract provides: "(11) All books relating to the ownership by said parties of said properties shall be kept by Forrest Hope, of Marfa, Texas, and all Bank deposits are to be made by him, and all bills are to be paid by him by checks on Bank account in the name of 'Copeland & Bennett Ranch Lands Ownership Account', whenever there are sufficient funds in said Account to pay such checks. He is also to pay all purchase money installments, principal, interest, State interest, grazing lease rentals, taxes and improvements charges by checks on said account, as they mature. The *amount actually invested in such ranch properties' by either of said parties at any time in cash, shall be determined by the figures shown and reflected by said books kept by said Hope."* (Emphasis ours)

Apparently the trial court construed the contract as providing that there should be added to the "amount actually invested in such ranch properties" in cash by Copeland as determined by the figures shown and reflected by the books kept by

Hope one-half of the excess advances made by Bennett, and that the same amount should then be deducted from such sum in order to comply with paragraph 4. A majority of the court is of the opinion that such construction is erroneous and requires the court to ignore entirely paragraphs 4 and 11 of the contract and to write a contract for the parties in an attempt to avoid a construction which would work a forfeiture of the defaulting party's capital investment; that the contract by the express provisions of paragraph 4 and paragraph 11 provides for a forfeiture of the defaulting party's capital investment to the extent at least that the investment of the non-defaulting party exceeds that of the defaulting party; that the contract by its very terms provides for this and is too clear and explicit to admit of any other interpretation; that a decree of specific performance would of necessity decree and enforce a forfeiture. Where the performance of a contract will render the defendant liable to a forfeiture the performance is a hardship and will not be decreed. Pomeroy's Equitable Remedies, Vol. 2, Sec. 800, p. 1320. Specific performance is a remedy intended to achieve equal and exact justice between the parties. It is not necessarily always awarded. If awarded here it would give the plaintiff reparation in full for the legal measure of his damages and likewise award him the land. Associate Justice Sutton does not agree with the majority views on this point nor with the majority's disposition of the case, and will no doubt incorporate his views in a dissent.

We hold that the sales paragraph of the contract provides for a forfeiture and therefore is not susceptible of specific enforcement in a court of equity, hence all other points become immaterial.

The judgment is reversed and here rendered that plaintiff take nothing on his suit for specific performance, and that the cause be remanded for a new trial on defendant's cross-action.

Reversed and rendered in part and remanded in part.

PRICE, C. J., concurs.

SUTTON, Justice (dissenting).

I am unable to agree with the construction adopted by the majority and the disposition made of this case. I have no inclination to argue at any considerable length, but merely to briefly point out my views.

It may be said in the beginning, in my opinion, the judgment of the trial court is not altogether free from question. This case does differ from the ordinary suit for the specific performance of a contract by an owner to sell his lands to another, as are the cases cited. In such cases if the party seeking specific performance fails to perform he suffers the consequences of his failure and is not entitled to his remedy and that is the end of the law suit, and nothing remains to be settled between the parties. It may be the trial court might have properly, had the evidence justified it, determined the rights of the parties on the cross action in order that the case might have been determined on the cross action in the event of failure of the specific performance. But, as pointed out by the majority, the cross action is disposed of and no complaint is here made on that account.

It is thought the point made by Copeland that the judgment lacks finality because performance is not made obligatory on the part of Bennett is not tenable. The sum of money decreed in favor of Copeland is purchase money for the property to be formally conveyed or conveyed by the judgment, and Copeland has his protection therein. If the judgment be not obligatory because it fails to provide the necessary process for its enforcement that can be and should be supplied in the appellate court. Wilcox v. State, 24 Tex. 544, 5 C.J.S., Appeal and Error, § 1882, p. 1367, and the cases there cited, including the Texas cases of Angelena County v. Bond, Tex.Civ.App., 15 S.W.2d 338; Jones County v. Moore, Tex.Civ.App., 4 S.W.2d 289 (e. r.).

All matters of the nature just referred to are eliminated by the determination of the majority.

It is always proper to look to the circumstances surrounding the making and execution of a contract and the situation of the parties. In the instant case Bennett and Copeland, two ranchmen, desired to enter into a ranching operation, and had in fact so embarked before the written contract was actually executed. It is perfectly obvious they each desired to protect against the possibility of a default or failure of the other and the enforced abandonment of the enterprise by one against the wishes and desires of the other. In other words, neither wanted to be compelled to give up the project because the other did not desire to continue, or could not. That is exactly what Copeland proposes, and more. He says the property is not susceptible to partition in kind and that it should be sold and the proceeds divided. He insists, because he has elected not to continue, or cannot, that Bennett abandon also the undertaking and then divide with him the profits, which he alleges is considerable, accrued as the result of Bennett's cash investment after he defaulted. In furtherance of that undertaking he insists on a construction of paragraphs 4 and 5 of the contract that will work a forfeiture and render the contract unconscionable, attributing to himself and Bennett the intention to so provide.

It is my humble opinion the contract does not so provide, nor is such an intention reflected by the terms of the contract. Copeland insists, and the majority agree with him, that the provision which authorizes the non-defaulting party to purchase the interest of the defaulting party at the amount which the defaulting party has actually invested in cash in the enterprise at the time of default, requires and provides that the non-defaulting party shall deduct from such amount the amount of cash such non-defaulting party actually has invested in excess of the one-half he was required under the contract to contribute. This is based upon the language of the two paragraphs (identical in all respects except as to the position of the parties) wherein it is said, "and from such cash price for said lands, both original and additional lands, the said L. M. Bennett is authorized to deduct whatever total amount I, the said Joe W. Copeland, may then owe to said

L. M. Bennett for moneys theretofore advanced by said L. M. Bennett to me, or for my account for the purpose of paying my one-half or any part of my one-half of any principal or interest installments on said notes or any of them, * * *." (Emphasis added).·

Certainly the provision does not provide that Bennett shall or may deduct his excess cash investment, as is contended by Copeland must be done. On the other hand, it merely provides first that he may deduct whatever Copeland owes him at the time of default for moneys theretofore advanced to him. I take it there is no question about that and that Bennett should and may properly deduct any sum Copeland owes him. The difficulty arises in connection with the next provision. Secondly, that Bennett is authorized to deduct moneys advanced *for my account for the purpose of paying my one-half, * * *.* (Emphasis added.) Copeland says this latter provision means and requires Bennett to deduct his excess cash investment, which if pursued to its logical conclusion would work a forfeiture, wipe out his cash investment, and take his interest for nothing. I cannot read the provision to mean that.

Money advanced "for my account" means exactly the same thing as money "paid for me". The record does not reflect that Bennett made any payments for Copeland, but is that Bennett's cash investment is in round numbers three times that of Copeland. Had Bennett made the payments for Copeland the situation would have been exactly the same as if Copeland had obtained the money from his bank or from another friend to meet his one-half of the payments and he would not have been in default but his cash investment would have been increased. He would have owed Bennett instead of someone else and Bennett would have been properly authorized to deduct it, but Copeland's fifteen thousand plus would have remained just the same. Bennett might have been willing to advance one or more payments for Copeland and protect him against default but unwilling to continue indefinitely to advance for him.

The payments made were not made for Copeland but for the joint venture and to protect its assets and had the effect of increasing Bennett's cash investment and his equity. The payments were not made for the personal benefit of Copeland necessarily but rather for the protection of Bennett and in the interest of his right to refund to Copeland his cash investment and continue the business rather than be forced out to the claimed enrichment of Copeland.

It is undenied and undeniable that Copeland is in default. If Copeland were credited with every claimed charge, regardless of the proof, against Bennett, he would still be in default. Copeland does not dispute his default, but insists he should be relieved of his contract and permitted to profit from Bennett's investments. In my opinion the trial court's judgment is a proper and equitable one and in accord with the solemn contract of the parties. I am unable to understand exactly how the trial court arrived at the amount due Copeland, but it is nevertheless a correct amount and should be permitted to stand regardless of the method by which it was arrived at. If he regarded the excess contributions made by Bennett as made for Copeland, then the amount was properly deductible, having given Copeland credit for the contribution, but my disagreement with that result has already been indicated.

Of course, I regard my construction of the contract a correct one and in accord with the plain provisions of the contract, but if I be in error in that, my construction is in all events, it is thought, as reasonable as the one contended for by Copeland and concurred in by the majority, in which event the construction which would preserve the contract and give effect to it, under an elementary rule of construction, should be adopted rather than one which would strike it down and permit Copeland to profit from his own default.

It is my opinion the judgment of the trial court may be properly reformed and affirmed, because it can be made as obligatory as any judgment for the recovery of money can be. In all events, it is thought the contract is one properly to be specifi-

cally enforced and the judgment in that respect should not be rendered.

There is nothing, in my opinion, unconscionable in the provision and agreement voluntarily entered into by the parties, nor in requiring Copeland to abide by it. It seems to me the equities favor Bennett and it would be altogether inequitable to force him out of the business and permit Copeland to profit as the result of his own default.